THE CRAWFORD COUNTY STATE BANK, as Adm'r of the Estate of Eugene Bloomingdale, Deceased, Plaintiff-Appellant, v. DWIGHT H. DOSS et al., Defendants (Marine American National Bank et al., Defendants-Appellees).

Fourth District   No. 4—88—0109

Opinion filed September 1, 1988.

Kenneth E. Baughman, of Monticello, and Harlan Heller, Ltd., of Mattoon, for appellant.

William L. Hatch, of Hatch, Blockman, McPheters, Fehrenbacher & Lyke, of Champaign, for appellee Commercial Bank of Champaign.

Stephen M. O'Byrne, of Reno, O'Byrne & Kepley, of Champaign, for appellee Marine American National Bank.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On May 1, 1986, then plaintiff, the National Bank of Monticello, as executor of the estate of Eugene Bloomingdale, deceased, filed a three-count complaint in the circuit court of Piatt County against defendants Dwight H. Doss (DHD), Arvilla M. Doss (AMD), the Marine American National Bank (Marine), and the Commercial Bank of Champaign (Commercial), seeking to set aside certain conveyances made by DHD and AMD to Marine and Commercial on the grounds the conveyances were fraudulent as to plaintiff, a creditor of DHD. An amended and a second-amended complaint were filed containing additional counts, but the first three counts remained the same. The Crawford County State Bank, as administrator of the estate of the aforementioned decedent, was eventually substituted as plaintiff.

On January 29, 1988, the circuit court entered summary judgment in favor of defendants as to counts I, II, and III. On March 7, 1988, the circuit court entered an order denying plaintiff leave to file an amended count VIII to the second-amended complaint. Then, the circuit court made findings pursuant to Supreme Court Rule 304(a) as to each of the above rulings. (107 Ill. 2d R. 304(a).) Plaintiff has appealed. We affirm the summary judgment as to count II and the order denying leave to file an amended count VIII. We reverse the summary judgments as to counts I and III and remand for further proceedings as to those counts.

The second-amended complaint alleges plaintiff's decedent became a creditor of DHD by virtue of a judgment in favor of that decedent and against DHD entered by the circuit court of Macon County on September 25, 1984, in the sum of $500,000 compensatory damages and $6 million punitive damages. This court reduced the punitive award to $2 million and affirmed the judgment as reduced. (*National Bank v. Doss* (1986), 141 Ill. App. 3d 1065, 491 N.E.2d 106.) The instant suit is brought pursuant to section 4 of "An Act to revise the law in relation to frauds and perjuries" (Act), which states:

"Every gift, grant, conveyance, assignment or transfer of, or charge upon any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to disturb, delay, hinder or defraud creditors or other persons, and every bond or other evidence of debt given, suit commenced, or judgment entered, with like intent, shall be void as against such creditors, purchasers and other persons." Ill. Rev. Stat. 1983, ch. 59, par. 4.

Count I is against Marine. It alleges: (1) on February 16, 1983, DHD transferred to AMD, his wife, 3,000 shares of common stock of First State Bank of Monticello, then owned by DHD; (2) the conveyance of those shares was made at a time when the previously described judgment in favor of plaintiff's decedent was anticipated and was made for the purpose of preventing that judgment "from becoming a lien" upon that stock and with intent to defraud plaintiff; (3) the conveyance was without consideration and left DHD insolvent; (4) on September 21, 1984, and after a jury had rendered a verdict in favor of plaintiff's decedent, AMD conveyed 733 of those shares to Marine in satisfaction of a previous debt of AMD and DHD to Marine; and (5) at that time Marine knew or should have known of the transfer of the stock by DHD to AMD and knew or should have known of the fraudulent intent of DHD in doing so. The count requested that a constructive trust be imposed on the 733 shares in favor of plaintiff.

Count II is also against Marine. It alleges: (1) on September 22, 1984, Marine "took a mortgage in the amount of *** ($85,000) from *** [DHD]" on a 35-acre tract; (2) DHD made that mortgage to prevent the then foreseen judgment of plaintiff's decedent from becoming a lien upon those premises; (3) Marine accepted the mortgage with knowledge of that intent; and (4) the execution of the mortgage made DHD insolvent and defrauded plaintiff as a creditor.

Count III is against Commercial. It asserts: (1) DHD transferred the previously described 3,000 shares of bank stock to his wife AMD with the fraudulent intent of preventing the judgment of plaintiff's

decedent from becoming a lien on the property; (2) AMD received the property with knowledge of DHD's intent; (3) no consideration was given for the transfer; (4) the transfer rendered DHD insolvent; (5) after the aforesaid judgment was entered against DHD, AMD transferred 1,500 of those shares to Commercial in satisfaction of a debt of DHD and AMD to Commercial and with the intent to prefer Commercial over plaintiff and to defraud plaintiff; and (6) Commercial was aware of defendants' intent.

Proposed amended count VIII was also against Marine. It alleged: (1) in August 1979, DHD guaranteed the note of another to Marine; (2) in December 1981, that "note was discharged by the assumption of the same by" AMD with DHD guaranteeing the assumption by AMD; (3) on September 22, 1984, AMD assigned to Marine her interest in an escrow account for the "purchase of certain real estate"; (4) the balance in that escrow account was then the sum of $11,400; (5) the escrow account had been used "to secure the original guarantee undertaking of [DHD]" on the aforesaid loan; (6) at the time of the assignment of the escrow account, Marine knew of the verdict in favor of plaintiff's decedent and against DHD; (7) judgment was then entered on that verdict, and the judgment, as reduced, affirmed on appeal; (8) AMD made the assignment to Marine because DHD anticipated the entry of judgment on the verdict against him; (9) Marine accepted the assignment with knowledge of fraudulent intent by DHD and AMD; and (10) the assignment impaired the rights of plaintiff because it left DHD without enough money to pay the judgment against him.

The issues concerning the summary judgment are the most important and will be discussed first. Summary judgment is properly entered under section 2—1005 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005) when the pleadings, depositions, affidavits, and other matters properly before the court show nothing is left for the trier of fact to decide. (*Fooden v. Board of Governors of State Colleges & Universities* (1971), 48 Ill. 2d 580, 272 N.E.2d 497.) The evidence thus shown must be viewed most favorably toward the party against whom the motion for judgment is directed. Plaintiff maintains the matters properly before the court at the time the summary judgment was entered indicated, at least, the existence of a factual question as to whether it could recover. We consider the evidence before the court in the light of the described function of a summary judgment.

No dispute exists as to the accuracy of plaintiff's allegations in regard to the judgment it had obtained against DHD, or that, at all

times, the assets of DHD were insufficient to pay the judgment even in its reduced amount after appeal. The evidence before the court at the time of the entry of summary judgment also showed DHD had been the owner of various tracts of real estate and of the previously mentioned bank stock; as the litigation giving rise to plaintiff's judgment proceeded, DHD conveyed most of these properties to or for the benefit of AMD or his children. The allegations that DHD made the conveyances of bank stock and executed the mortgage to Marine as set forth in the complaint are also not disputed. Facts favorable to Marine and Commercial which are undisputedly shown are: (1) the value of the bank stock taken in by Marine and Commercial in discharge of indebtedness to it by DHD and AMD was approximately the same as the amount of indebtedness; and (2) DHD received approximately $85,000 from the loan secured by the mortgage to Marine and used those proceeds as follows:

"(1) to pay off a prior encumbrance on the land, $28,059.85;

(2) to the Illinois Department of Revenue for taxes, $7,500;

(3) to the Internal Revenue Service for taxes, $25,000;

(4) to Marine for a certificate of deposit, $11,756.13; and

(5) to purchase a riding mower and to pay off other creditors, the balance of approximately $12,500."

The evidence deposition of an attorney for Marine at the time the mortgage loan was made to DHD indicated DHD approached the attorney in September 1984 and requested a loan to pay attorney fees. The attorney ultimately told DHD Marine would not make a loan to him unless certain obligations of AMD to Marine upon which DHD was a surety were paid. The transactions of DHD with Marine concerning the bank stock and the mortgage on the real estate were then consummated. The attorney checked carefully to see that the mortgage was executed and filed before the multimillion dollar judgment against DHD was entered. Marine did not require any new financial statements from DHD before entering into either transaction.

The evidence in regard to the transaction with Commercial showed that DHD had an outstanding loan from Commercial at least as far back as 1979. According to the deposition of the president of Commercial, in the fall of 1984 DHD contacted him, offering to convey stock in the First State Bank of Monticello to Commercial in discharge of a loan upon which DHD, AMD, and a third person were liable. According to the Commercial president's testimony, some two weeks later agreement was reached, and the above-described indebtedness totaling approximately $195,000 was discharged in exchange for 1,500 shares of the bank stock which stood in the name of AMD.

■ In our analysis of the summary judgment, we deem it appropriate to discuss, first, the summary judgments entered on counts I and III, which concerned the conveyance of shares of stock to Marine and Commercial, respectively, in exchange for the discharge of debts owed to those banks. As DHD was unable to pay for a judgment likely to be entered against him at that time and to also pay all of his other unsecured creditors, these transactions constituted a preference of Marine and Commercial as creditors. However, under Illinois law and that of most other States, the mere preference of one or more creditors over others does not constitute a violation of section 4 of the Act (Ill. Rev. Stat. 1983, ch. 59, par. 4) or a fraud in equity. The preference becomes fraudulent only when accompanied by bad faith on the part of a transferee. (*Albers v. Zimmerman* (1941), 376 Ill. 306, 33 N.E.2d 452; *Beery v. Hurd* (1938), 295 Ill. App. 124, 14 N.E.2d 656.) Plaintiff maintains summary judgment as to counts I and III was error here because the evidence presents at least a factual question of the requisite bad faith. Plaintiff cites *Alan Drey Co. v. Generation, Inc.* (1974), 22 Ill. App. 3d 611, 317 N.E.2d 673, and *Wilkey v. Wax* (1967), 82 Ill. App. 2d 67, 225 N.E.2d 813, in support of its contention.

In *Drey*, the plaintiff, defendant, and respondent in supplementary proceedings were all publishers. The plaintiff sold a subscription list to the defendant, who gave a judgment note as consideration. Upon the defendant's default on the note, the plaintiff took judgment by confession for $98,376. While a motion to vacate that judgment was pending, the defendant sold the subscription list to the respondent for $150,000 under an agreement whereby the sale would not be disclosed and the proceeds would be put in a special account. The subscription list was apparently the only remaining asset of the defendant. The proceeds of the sale were used partially to pay some creditors and also to purchase some stock for the defendant in a corporation where defendant's officers had an interest. The appellate court ultimately upheld the circuit court's determination in a supplementary proceeding brought against the respondent to that proceeding to set aside the sale of the subscription list to the respondent by the defendant.

In *Wilkey*, the defendant's husband murdered the plaintiff's husband. The plaintiff then brought a civil damage suit against the defendant's husband for wrongful death. The defendant's husband was then convicted of the crime. Defendant then obtained a decree of divorce from her husband. That decree approved a property settlement whereby substantially all of the husband's assets, having a value

of some $12,639.52, were transferred to the defendant. Then, judgment was entered in the civil suit in favor of plaintiff in the sum of $30,900. Plaintiff then brought suit against defendant to set aside the $12,639.52 transfer, the court-approved property settlement, and obtained judgment. On appeal, this court affirmed. The opinion was based upon the indication that the husband had colluded in the property settlement, and this court approved a factual finding that the property settlement was fraudulent even though the husband's obligation to support the family created sufficient consideration for it. This court did not mention the rule that the mere preference of one creditor over others does not create a fraudulent conveyance.

In either *Thompson v. Williams* (1955), 6 Ill. 2d 208, 127 N.E.2d 457, or *Drey*, the following factors have been deemed proper to consider in determining whether a preference of a creditor is in bad faith: (1) the insolvency of the debtor; (2) the consideration for the conveyance; (3) the status of the judgment; (4) whether all the assets of the debtor are reduced for cash; and (5) whether the asset conveyed is the only remaining unencumbered asset of the debtor. *Thompson*, 6 Ill. 2d at 212, 127 N.E.2d at 460; *Drey*, 22 Ill. App. 3d at 618, 317 N.E.2d at 679.

Analysis of the element of bad faith developed by the case law as applied to the preference given to Marine and Commercial here by the conveyance of the shares of stock is difficult. The situation here differs from that in *Drey* because neither Marine nor Commercial agreed to keep the transaction secret, and no secret trust fund was created. Furthermore, the stock conveyance transactions merely concerned the acceptance of assets for debts of equal value. In *Wilkey*, this court emphasized the collusive nature of the property settlement agreement. Moreover, preferences arising from conveyances between husband and wife have been held to require special scrutiny. (37 C.J.S. *Fraudulent Conveyances* § 252, at 1085 (1943).) Although evidence indicated both Marine and Commercial likely knew of DHD's deteriorated financial condition, no evidence of any collusion between them and DHD or AMD was shown.

In the transactions involved in counts I and III, the evidence showed DHD was insolvent, but the consideration for the conveyance was satisfactory. The judgment making plaintiff a creditor had not been entered at the time of the granting of the preferences, but we do not deem that to be controlling. This court indicated in *Wilkey* that, when, as here, the entry of judgment is highly likely at time of conveyance, the doctrine of fraudulent conveyance (Ill. Rev. Stat. 1983, ch. 59, par. 4) is applicable. No reduction of the debtor's assets

for cash was directly involved. The assets conveyed were not the only remaining assets of the debtor, but the transaction did greatly deplete those assets. We do not find either the precedent of *Drey* or *Wilkey* or the criteria set forth in *Thompson* and *Drey* to be dispositive of the issue before us.

Because of the difficulty of the problem presented, we have looked further for aid in our analysis. We deem the following to be pertinent:

> "The transfer is not subject to attack by reason of knowledge on the part of the transferee that he is preferred to other creditors, nor does the transferee lack good faith because he knew his debtor's purpose to prefer or because he actively sought the preference. Neither can the transfer be attacked on the ground that the creditor knew that the transferor was insolvent, that the collection of the claims of other creditors would be hindered or defeated, or that the debtor intended to defeat the collection of their claims. Knowledge on the part of the creditor receiving the preference that the debtor has acted with fraudulent intention is immaterial if the creditor has done nothing except to receive payment of his claim." 37 Am. Jur. 2d *Fraudulent Conveyances* §89, at 772-73 (1968).

> "An obligation which binds the transferor contingently or secondarily is a good consideration for the conveyance. Thus, the liability of a surety on an unmatured obligation is a lawful debt, claim, or demand which will sustain a transfer to secure the payment thereof." 37 Am. Jur. 2d *Fraudulent Conveyances* §93, at 776 (1968).

■ Nothing in the text is inconsistent with the Illinois decisions called to our attention. Accordingly, we conclude here that no fraud arose because of knowledge by Marine or Commercial that DHD was (a) insolvent, (b) intending to prefer them, (c) intending to hinder other creditors, or (d) attempting to defraud other creditors in other transactions. The fact that DHD's liability on some of the indebtedness cancelled was merely secondary to that of his wife or another did not render the preference fraudulent. However, one element clouds the transactions involving the conveyance of the shares of bank stock: these shares were not conveyed directly by DHD but by AMD, who had received them from DHD.

Apparently, the circuit court, Marine, and Commercial all proceeded on the theory that, even if the conveyance without consideration by DHD to AMD was fraudulent, this fraud was nullified when AMD conveyed the shares to a creditor of DHD, effectuating a prefer-

ence which he could have made directly. This theory is in conformity to what is likely the majority rule in the nation (37 Am. Jur. 2d *Fraudulent Conveyances* §235, at 889-90 (1968)), but it is not the rule in Illinois. That precedent is ancient, but we deem it binding.

In *Waggoner v. Cooley* (1855), 17 Ill. 239, a merchant conveyed his stock in trade to his clerk to avoid payments of his debts and absconded. A creditor obtained a writ of attachment upon which a sheriff went with the creditor to the clerk in order to levy on the goods. At that time the clerk worked out a settlement with the creditor whereby the creditor obtained the goods in discharge of the merchant's debts. Other creditors brought an action in trover for the goods. The supreme court reversed a circuit court judgment on a jury verdict determining rights in the property and remanded for a new trial. The supreme court held that any fraud in the original transfer by the merchant to his clerk tainted the subsequent conveyance of the property by the clerk to the first creditor. This was true even if no fraud otherwise arose from the latter conveyance as long as the first creditor knew of the fraud in the original transfer. Accordingly, the supreme court determined that ruling on instructions inconsistent with that holding required a new trial. *Dictum* consistent with *Waggoner* is contained in *Jewett & Root v. Cook* (1876), 81 Ill. 260.

In *Hoff v. Larimore* (1903), 106 Ill. App. 589, the plaintiff, a creditor of a debtor, brought suit against a defendant, also a former creditor of the debtor, seeking recovery because of a preference given to the defendant former creditor. There, as here, the debtor had conveyed property to his wife. When the defendant creditor had obtained judgment on his claim against the debtor and attempted to levy on the property conveyed to the wife, agreement was reached whereby the property was conveyed to the defendant creditor in exchange for his release of the judgment. The judgment was found to be in an amount which equalled approximately 60% of the value of the property conveyed. The litigation between the plaintiff and the defendant ensued, and the circuit court found for the plaintiff. The appellate court affirmed, holding that the original conveyance by the husband to the wife was fraudulent and known by the defendant to be such and tainted any conveyance by the wife to the defendant. Thus, the subsequent conveyance in discharge of the debt was fraudulent, even if the debtor could have properly made a preferential conveyance to defendant directly. *Waggoner* and *Jewett* were cited. No reference was made to the fact that the preference given the defendant was also tainted by the disparity between the amount of his judgment and the value of the property. See also Annot., *Rights as between creditors of*

*fraudulent grantor, where one or more of them, in payment of or as security for his debt, receives deed or mortgage from fraudulent grantee*, 114 A.L.R. 406, 412 (1938).

■ Here, DHD may have conveyed the bank shares to AMD merely to aid in paying off creditors, but, under the evidence shown, a trier of fact could also have found that the intent in making the gratuitous transfer was to hinder his creditors. Accordingly, we conclude that, under the ancient but unrefuted precedent of *Waggoner* and its progeny, a factual question exists as to counts I and III.

■ The situation in which plaintiff seeks relief under count II differs materially from that which concerns counts I and III. No conveyance without consideration by DHD to AMD or anyone else is involved. Rather, Marine paid DHD approximately $85,000, and DHD conveyed to Marine a note in that amount and a mortgage on real estate owned by DHD securing that note. The undisputed evidence indicated DHD stated to Marine's attorney he wanted the money to pay attorney fees. Actually, $28,059.85 of that sum was used to pay off existing indebtedness which was secured by a first lien against the property. Much of the rest was used to pay high priority debts. No showing was made that any sums were placed in any secret accounts or that any agreement was made to keep the transaction a secret. Although the evidence indicated some of the proceeds were used to prefer some creditors, no evidence indicated any of the proceeds were used to defraud any creditor. Even though Marine may have known of DHD's insolvency or even that DHD had attempted to defraud some creditors by conveyances of properties to AMD or other relatives or friends, no aspect of the transaction was fraudulent. The circuit court properly granted summary judgment to Marine as to count II.

■ We do not understand the theory of proposed count VIII. It would hold Marine to be guilty of fraud for accepting an assignment of money from AMD, who was not the judgment debtor, to be applied on indebtedness upon which AMD was liable as a principal and DHD was liable only as a surety. The count makes no allegation DHD, the judgment debtor, ever owned the rights to the money in the escrow account. We see no reason why AMD could not assign her interest in that account to Marine. She had no obligation to preserve her assets for the benefit of DHD's creditors. We see no reason why Marine could not accept the assignment of the escrow funds in good faith from AMD even if it knew DHD was likely to have a large judgment, which he could not pay, rendered against him. Proposed count VIII did not state a cause of action, and the circuit court did not abuse its

discretion in refusing to allow plaintiff to amend its complaint again to include that count.

As we have indicated, we affirm the summary judgment in favor of Marine as to count II and the order denying plaintiff leave to amend to add count VIII to its second-amended complaint. We reverse the summary judgment entered as to counts I and III and remand to the circuit court of Piatt County for further proceedings.

Affirmed in part; reversed in part and remanded.

McCULLOUGH and SPITZ, JJ., concur.