CRAWFORD COUNTY STATE BANK, as Adm'r of the Estate of Eugene Bloomingdale, Deceased, Plaintiff-Appellant, v. MARINE AMERICAN NATIONAL BANK *et al.*, Defendants-Appellees.

Fourth District   No. 4—89—0873

Opinion filed June 27, 1990.—Rehearing denied August 2, 1990.

Kenneth E. Baughman, of Monticello, and Harlan Heller, Ltd., of Mattoon, for appellant.

Hull, Campbell & Robinson, of Decatur (Michael I. Campbell, of counsel), for appellees Patrick J. Calhoun and Arvilla M. Doss.

Stephen M. O'Byrne, of Reno, O'Byrne & Kepley, P.C., and William L. Hatch, of Hatch, Blockman, McPheters & Fehrenbacher, both of Champaign, for appellees Marine American National Bank and Commercial Bank of Champaign.

JUSTICE SPITZ delivered the opinion of the court:

The declaratory judgment action of plaintiff, Crawford County State Bank, administrator of the estate of Eugene Bloomingdale, deceased, sought to set aside allegedly fraudulent conveyances of shares of stock by defendants Dwight H. Doss and Arvilla M. Doss to defendants Marine American National Bank (Marine) and the Commercial Bank of Champaign (Commercial), and to have the court declare constructive trusts therefor. Plaintiff also asked the court to declare the transfer of stock from Dwight to Arvilla before the transfer to the banks to be a fraudulent conveyance. Plaintiff's decedent was a creditor of Dwight. Dwight is now deceased and Patrick J. Calhoun, administrator with the will annexed of the estate of Dwight, has been substituted as a defendant.

Previously, this court considered an appeal by plaintiff from an order of the circuit court of Piatt County granting summary judgment in favor of defendants as to counts I, II, and III, and denying plaintiff leave to file an amended count VIII to the second-amended complaint. This court affirmed the summary judgment as to count II, as well as the refusal to allow an amended count VIII. However, the summary judgments as to counts I and III were reversed and the cause was remanded for further proceedings. *Crawford County State Bank v. Doss* (1988), 174 Ill. App. 3d 574, 528 N.E.2d 436.

On remand, a bench trial was conducted resulting in a judgment

being entered in favor of defendants and against plaintiff. Following the denial of plaintiff's post-trial motion, plaintiff appealed. On appeal, the only issue raised is whether the judgment in favor of defendants was against the manifest weight of the evidence.

As a result of an earlier jury trial, Jacqueline Morris, guardian of the estate of Eugene Bloomingdale, obtained a judgment on September 25, 1984, against Dwight in the amount of $500,000 compensatory damages and $6 million punitive damages. The action arose as a result of improprieties in probating the estate of Lavina Patient by Dwight, an attorney, on behalf of Bloomingdale, the executor and sole heir. On appeal the judgment was affirmed as to liability and compensatory damages, but the award of punitive damages was reduced to $2 million. *National Bank of Monticello v. Doss* (1986), 141 Ill. App. 3d 1065, 491 N.E.2d 106.

A financial statement prepared by Dwight for himself and Arvilla was submitted to Marine and purported to be a statement of their financial condition as of 1979. The Dosses' total assets were shown as valued at $2,938,500. Included among the assets were shares of First State Bank of Monticello stock, valued at $450,000; Trout Lake in Wisconsin, $135,000; village lots in Wisconsin, $25,000; antique shop in Wisconsin (real estate only), $120,000; residence in Monticello, $300,000; 35 acres adjoining the residence in Monticello, $470,000; 240 acres of Monticello township farmland, $1 million; 62 acres in Macon County, $150,000. The financial statement indicated the shares of stock in the First State Bank of Monticello were held in the name of Dwight H. Doss. Similarly, a financial statement submitted by Dwight on behalf of Dwight and Arvilla to Commercial purported to indicate their financial condition as of July 20, 1976. On that document the shares of stock were also indicated to be held in the name of Dwight H. Doss. Arvilla admitted her signature appears on each of these.

At trial, the evidence deposition of Dwight was introduced. Dwight was then 72 years old. Dwight identified a financial statement he prepared on behalf of himself and Arvilla, to which he signed her signature, which purports to be a statement of their financial condition as of January 16, 1980. Another financial statement bearing a March 15, 1980, date was prepared by Dwight, and he signed his name and that of Arvilla to that statement as well. On the second of those documents, the 3,000 shares of common stock in the First State Bank of Monticello were also shown to be held in the name of Dwight H. Doss. Dwight admitted he owned these shares at one time, but he conveyed them to Arvilla. He would not disagree that the bank records reflect a February 16, 1983, transfer date, but he testified they

may have been conveyed earlier. He does not recollect when Arvilla took the shares to the bank to have shares issued in her name. Nor does he recall whether this transaction involved an exchange of consideration for the shares.

Prior to the judgment in favor of Bloomingdale's estate, Dwight conveyed the residence in Monticello to his wife, Arvilla, with the exception of 35 adjoining acres. The deeds conveying said property do not indicate that any consideration was given for this transaction. The Dosses jointly deeded the property to Dwight's secretary Ina Mae Glasgow and she, in turn, deeded the two portions of the property back to the Dosses, thereby separating the residence from the remainder of the land. These transfers occurred in January 4, 1982.

On December 29, 1981, Dwight transferred a Monticello township farm consisting of 240 acres to Larry LeCrone, Sue A. LeCrone, and Frances LeCrone in exchange for cash and 160 acres in Champaign County. An assumption of the Dosses' existing mortgage was also involved, and the balance over and above the mortgage was paid in cash. This payment amounted to $290,474.84, as shown by the check from Larry LeCrone. The 160-acre Champaign County farm was deeded from LeCrone to the First State Bank of Monticello as trustee under trust No. 732, the beneficiary of which is Arvilla. At the time of the evidence deposition, Dwight no longer had the proceeds of the check.

On January 4, 1982, Dwight transferred to Arvilla a portion of the land on Trout Lake, Wisconsin, whereon a cabin was located, in exchange for the lots in Boulder, Wisconsin. Dwight sold the two lots at about the same time. Also on January 4, 1982, Dwight and Arvilla deeded an undivided three-fourths interest in the remainder of the property to their children. An undivided one-fourth interest in this property was transferred to Arvilla. According to Dwight, these deeds were executed to conclude a transaction initiated in the late 1960's, at which time his son, Judson, paid $3,500 for the land. Because of Dwight's failing health, they thought it was time to memorialize this transaction. While recognizing his two daughters are also grantees, Dwight stated he did not know how the children handled the financial arrangements between them. A gift-tax return was prepared and filed "to cover any additional value since we are delivering this deed so late." Dwight also acknowledged that on December 24, 1981, he deeded to himself and his wife the Trout Lake property, with the exception of the portion with the cabin on it. Dwight testified that this too was in connection with "the lot deal" he testified about earlier.

On or about February 29, 1980, Dwight and Arvilla became the joint owners of a Northwestern Mutual Life Insurance Company policy on the life of Theodore C. Christman, which was previously issued on June 6, 1976. Subsequently, on April 24, 1984, Dwight conveyed his interest in the policy to Arvilla.

Dwight also had an interest in real estate located on Springfield Avenue, Champaign, Illinois. However, Christman had challenged Doss' title to this property. In addition, there was an $85,000 mortgage on the 35-acre parcel in Monticello at the time of the deposition. The mortgage was executed on September 22, 1984. In obtaining the mortgage, Dwight dealt with Richard O'Neill at Marine. Dwight did not know whether O'Neill was aware of the $6.5 million judgment at that time, but it was in all the newspapers. He also did not know whether he discussed the judgment with Rex Reu, Marine's attorney. Dwight also signed a note at this time and the bank delivered the $85,000. At the time of the loan, there was a preexisting mortgage in favor of the First State Bank of Monticello which was paid off as a result of that transaction. The amount of the preexisting mortgage was $28,059.85. The balance of the loan proceeds was utilized to purchase money orders at the First State Bank of Monticello to make the following payments: $7,500 to the Illinois Department of Revenue; $25,000 to the Internal Revenue Service; $7,700 to Dwight H. Doss, and $11,756.13 to Marine. All the money orders were purchased on September 22, 1984. The check to Marine was used to purchase certificates of deposit (CDs). With the remaining money, Dwight purchased a new John Deere riding lawn mower.

Dwight testified he transferred the 3,000 shares of stock because (1) he had involved Arvilla and his legal secretary on some big notes to Commercial regarding the Christman matter, and (2) he had some serious, life-threatening health problems. He was trying to enable Arvilla to pay off these debts and the debt to Marine.

The parties stipulated to articles which appeared in the Champaign News-Gazette concerning the estate of Bloomingdale case. These articles were published on August 22 and 30, 1984.

James Ballsrud, executive vice-president and cashier at the First State Bank of Monticello, testified he is in charge of stock transfer records. As of January 1, 1980, Dwight owned 3,500 shares of stock in the First State Bank. The holding company was formed in May 1984, and all First State Bank shares were surrendered for identical shares of First State Bank Corporation. The bank records indicate the shares were transferred to Arvilla on February 16, 1983. Prior to that date, Arvilla had owned 84 shares. On September 6, 1984, Arvilla re-

ceived an additional 24 shares from Ina Mae Glasgow. At that time, Arvilla had a total of 3,108 shares. On September 21, 1984, 733 shares were transferred to Marine. On September 22, 1984, 300 shares were transferred to Hull, Campbell & Robinson. On September 24, 1984, 1,500 shares were transferred to Commercial, and 575 shares to W. Judson Doss. At the time of the trial, Arvilla owned eight shares in the bank. At about the time of the transfer, Richard Jorgensen of Commercial called Ballsrud to inquire as to the number of the shares owned by Arvilla and the value. The new certificates were picked up by Glasgow. Ballsrud did not see Arvilla in the bank or talk to her about the transfer. Nor did he talk to Glasgow. At the time of the transfer of shares from Dwight to Arvilla, Ballsrud had no information available to him which would raise a question about the propriety of the transfer.

Arvilla testified she was 76 years old and was married to Dwight for 50 years prior to his death on May 28, 1989. She does not remember being aware of any claims made by Bloomingdale or his guardian, but she was aware Dwight purchased real estate from Bloomingdale, which Bloomingdale had inherited from Patient. She was also aware of a show "60 Minutes" did on the claim in February 1980, but she did not watch that show. Arvilla remembers being in Commercial Bank, but she does not remember with whom they met, the date, or any conversation. With regard to the Marine Bank, she remembers meeting Richard O'Neill. She did not pay attention to the conversation between O'Neill and Dwight. Arvilla testified that the 62 acres in Macon County, noted in the financial statement, were from the Patient estate and had been transferred to Gary Johnston, so Dwight no longer owned that property in 1984. She does not recall if there was any money remaining due on the contract at the time the Bloomingdale judgment was rendered. Arvilla did not direct Ballsrud to transfer the stock. She believes her husband did. He made all business decisions, and she did not object to his decisions. Nor does she know why they elected to make early repayment of the loans at Commercial and Marine.

According to Arvilla, the 3,500 shares of stock were transferred to her because of Dwight's health problems and, as a result, she wanted to pay off what she terms his "legitimate" debts, so she would not face those after he died. She did not classify the Bloomingdale estate as a legitimate creditor. She later testified that Bloomingdale did have a legitimate claim in that Dwight had purchased farmland and all monies due under the contract had not been paid at the time of the earlier trial. At the time of the stock transfer,

she was signatory on the notes at Marine and Commercial. She does not recall ever telling O'Neill, Jorgensen or anyone else at either bank that she was the owner of the shares that would be transferred to those banks. She did not participate in any negotiations with either bank. The transfer of the stock was not a gift to her. She did not pay the debt shortly after the stock transfer because she was preoccupied with her husband's health problems.

David Downey is a self-employed life insurance salesman and was a member of the board of directors of Commercial from 1978 to 1987 or 1988, when Marine acquired Commercial. He was also on the loan committee. The loan to Dwight Doss was a loan about which the committee had some concerns because the payments were not timely, and because of Dwight's involvement in a loan to Ted Christman that had deteriorated. In addition, there was no current financial statement on file for Doss and bank examiners consider it good policy to have current statements. Therefore, the bank officers were generally instructed to have current financial statements. In 1983, Jorgensen was the chief executive officer of the bank. Jorgensen was also on the loan committee and a member of the board of directors. Jorgensen had the ultimate responsibility for the management of the bank, including loans. The Doss debt in August 1984 was around $200,000, and Jorgensen advised the committee that some stock in the Monticello bank had been tendered in payment, that the value approximated the total outstanding debt, and it was recommended the settlement be accepted. This occurred in August or September 1984. The committee may have given Jorgensen an acceptable settlement range beforehand, instead of having to pass on the legitimacy of the offer before it was accepted. The signatures on the loan documents were those of Glasgow, Arvilla, and Dwight. When presented with this proposal, Downey was concerned with the preference problem. He was aware of the $6.5 million verdict against Dwight and recommended Jorgensen discuss the preference question with counsel. He learned of the verdict from the newspaper reports. Downey described Jorgensen as a careful and prudent businessman. Downey learned the stock tendered in payment was registered in Arvilla's name, but he is not sure whether he learned of this before or after the transaction was completed. Jorgensen advised that he had talked to officers at the First State Bank of Monticello and was told the market value approximated the size of the debt. Ordinarily before accepting stock in payment, the ownership is checked with the registering corporation. In determining the market value of stock in a small bank, one usually checks with a bank officer, who would review the most recent

sale of stock and the book value.

Richard Jorgensen is currently the president of Marine. He became president of Commercial in January 1978 and held that position through 1984. The function of the loan committee was to consider and approve or disapprove of loan requests in excess of amounts which bank policy authorized officers of the bank to grant without seeking permission of the committee. The Doss loan was considered by both the loan committee and board of directors. He remembers seeing the financial statement of Dwight and Arvilla in 1978 or 1979, but he does not recall reviewing it before closing the deal which terminated the loan. He admits the document was in the bank's file and that the document indicates Dwight was the sole owner of the shares of stock in question.

Sometime before August 13, 1984, Jorgensen received a message, while he was attending a bank meeting in Chicago, to call Dwight. In the subsequent telephone conversation, Dwight asked if the bank would consider receiving stock in payment of his debt. Jorgensen indicated they might consider it. In a second telephone conversation, Dwight inquired whether the bank would accept stock in payment of the debt and whether the bank would discount the debt. Jorgensen replied the bank would consider any offer Dwight wanted to make. There were several telephone conversations, in one of which Jorgensen indicated the bank would not discount the debt. Finally, Dwight came to Jorgensen's office, made an offer of $150,000 and, after negotiations, raised the offer to around $195,000. At the executive committee meeting on Monday, August 13, 1984, Jorgensen related to the committee that Dwight visited the bank and offered to pay off the loan at a discounted rate of $150,000. Dwight advised Jorgensen he was going on trial on August 20 and needed an answer by August 14, 1984. The next conversation he had with Dwight would have been to verify what was to be transferred in payment, and this was done after consulting with counsel and after making a recommendation to and consulting with the executive committee, which was the same as the loan committee. The bank eventually accepted a transfer of stock in the First State Bank Corporation of Monticello.

Thereafter, the Dosses came to Jorgensen's office on September 24, 1984, and tendered 1,500 shares of stock that had already been registered in Commercial's name. Jorgensen had previously discussed the market value of the stock with Ballsrud on a couple of occasions, and therefore, the stock was accepted, the note cancelled, and Commercial released the $1 million life insurance policy on the life of Ted Christman, which had been assigned to the bank. The bank believed

the stock was worth $130 per share, for a total of $195,000. After the Dosses left the bank, Jorgensen again called Ballsrud to inquire whether the stock had been properly transferred and to make sure there were no liens. This is the first time Jorgensen became aware that the stock was owned by Arvilla. This was the only time Arvilla was in the office. And he never conferred with Arvilla in the negotiations leading up to the transfer. All of the negotiations were with Dwight.

Prior to the transfer of the stock, Downey expressed concern about the preference question. The concern arose because of attempts by parties not known to Jorgensen to have Dwight placed in involuntary bankruptcy. Jorgensen was aware of the $6.5 million verdict and he imagines that had something to do with the attempt to place Dwight in involuntary bankruptcy. He was aware of the verdict because of the newspaper articles. Jorgensen did not know he was accepting stock from Arvilla until after the fact. The extent of his inquiry concerning the stock was whether or not there was stock and the market value of it. He had discussed the whole situation with counsel and was advised it was proper to receive the stock. At the time of the transfer, he was not aware Dwight had disposed of all of his other assets. He made no effort to talk to Arvilla aside from casual conversation. His prime concern was to get the loan off the books. The fact Dwight said he was going to trial in August did not make him suspicious concerning the legality of the transaction. He relied on counsel to advise him concerning the legality of the proposed transaction. Dwight did not comply with a request to provide an updated financial statement and, on one occasion, the bank's attorney sent Dwight a letter regarding payment. Poor payment performance was one of the reasons Jorgensen wanted to get rid of the loan. He thought Dwight owned the stock. Dwight never asked Jorgensen to keep the transaction a secret, nor did he indicate an intent not to pay anybody else. Their discussions did not include a discussion of payments to others.

The loan was evidenced by a $270,000 promissory note dated November 29, 1976, showing an interest rate of 7½% and signed by Glasgow, Dwight, and Arvilla. There was a loan modification and extension agreement signed by the same three individuals on June 14, 1979. The previous note called for the entire debt to be paid off at maturity on October 15, 1977, and the modification agreement amortized the loan to allow monthly payments of $3,000 beginning July 1, 1979, with all sums remaining unpaid to be due and payable on or before December 1, 1989. He does not know why the original note was

not paid on the due date. From the time of the agreement in 1979 to the loan termination in 1984, there had been a reduction in debt of about $80,000. No notice of default had ever been sent, but notice of past-due payments had been sent. Any default was always cured within the 30-day grace period and there was no acceleration of the debt, or opportunity to do so. Furthermore, the agreement did not include a provision requiring the debtors to furnish a financial statement to the bank and, without such a provision, the bank could not legally force the debtors to furnish a financial statement. The life insurance policy on the life of Ted Christman was collaterally assigned to the bank as security for the loan and, when the debt no longer existed, the collateral was released.

Jorgensen appeared in court in the Bloomingdale case in early 1980 in conjunction with the production of the financial records of Dwight.

The parties stipulated that Mark Ferguson would testify that Jacqueline Morris, as guardian of the estate of Eugene Bloomingdale, filed an action against Doss in Macon County on March 25, 1980, and since judgment was entered in September 1984, Ferguson has initiated citation proceedings against Dwight, but had been unable to collect any funds to apply against the judgment. Morris would testify the "60 Minutes" television show was aired on channel 3, the CBS affiliate for the Champaign, Piatt, and Macon County area, on February 24, 1980. She would further testify that as guardian she was unable to collect any monies from Dwight from the time of judgment to Bloomingdale's death in 1985. Plaintiff also called Mark Janiak, vice-president of Marine, to testify, but Janiak testified he had nothing to do with the Doss loan. The court ruled Janiak was not qualified as an expert witness and rejected the offer of proof. Since no issue is raised on appeal concerning the qualification of Janiak as an expert, or whether the offer of proof was properly rejected, there is no need to further summarize Janiak's testimony.

Richard J. O'Neill is in charge of the retail operation of Marine and in 1984 he was executive vice-president of Marine American National Bank, the predecessor of Marine. He handled about 95% of all matters dealing with the Doss loan. On January 25, 1980, a loan of $25,000 was issued to C.J. Marketing, Inc. The note was signed by Vivian and Clifton Christman, and cosigned by Dwight. The money was to purchase used cars for resale. On January 21, 1981, an $89,000 note was executed by Arvilla. The purpose of this note was to pay off notes that had accumulated for C.J. Marketing or the Clifton and Vivian Christman loan. On February 24, 1984, a $99,000 note was

executed by Arvilla to review the note she previously signed. Between the $89,000 and $99,000 loan there was another loan. The loans were due annually; on the first loan, the interest accumulated and was added to principal, making $100,000 due. When the note was renewed, the Dosses paid all the interest, so there was a reduction of the amount due to $99,000. In addition, the witness identified an undated guarantee signed by Dwight for the benefit of loans extended to Arvilla, a guarantee executed by Dwight on August 3, 1979, for the benefit of C.J. Marketing or Clifton J. Christman, and a guarantee executed by Dwight on February 29, 1984, for financial accommodations extended to Arvilla. The reason Dwight signed the original note and Arvilla the second note was due to Dwight being out-of-State on a couple of occasions, being difficult to contact, and being quite ill. The bank was concerned about his ability to execute notes. They really wanted both Dwight and Arvilla on the note, but ended up having Arvilla sign the note and Dwight guaranteeing it. O'Neill was aware in 1981 that an estate was suing Dwight. At the time of the last note, Dwight was told there would be no more extensions. That note was due in February 1985. Even though the note was in Arvilla's name, Dwight did all the negotiating.

Concerning the payoff of the loan, Dwight contacted O'Neill about three to four weeks before the deal was consummated. At the time, Dwight came to the bank and requested the bank accept 50 cents on the dollar. O'Neill was aware of the lawsuit then pending and referred Dwight to Rex Reu, the bank's attorney, before proceeding further with negotiations. O'Neill was advised, either by Dwight directly or through Reu, that Dwight needed money after the Macon County trial and the bank agreed to lend him $85,000. To discharge the existing loan, Dwight agreed to transfer 733 shares of stock to the bank. No indemnification was sought from either of the Dosses in case the title to the bank stock was defective. O'Neill never did that with anyone, and he was satisfied the stock was valid. Reu brought the shares to the bank. To the best of O'Neill's recollection the deal was consummated on Saturday, September 22, 1984. Dwight purchased two CDs, amounting to about $10,000 each, which the bank retained to pay the first two installments. These CDs were applied to the installments and that is all the money the bank received on that note. It was Dwight's request and decision to buy the CDs, not the bank's.

O'Neill was aware of the $6.5 million judgment against Dwight, having read about it in the newspaper. He also saw the last minute of the "60 Minutes" program.

O'Neill was aware the stock offered in settlement of the loan was

from the First State Bank of Monticello. He discussed the value of the stock with personnel at the Monticello Bank, but he cannot remember discussing who owned it or whether it was transferable. While he would ordinarily determine the value of the shares before entering into a deal such as this, he would not ordinarily determine the number of shares owned by that person because he would require receipt of sufficient shares before releasing the note. He may have become aware that the title of the stock was in Arvilla's name, but it really did not make any difference to O'Neill whether Arvilla or Dwight owned it.

At the time of the original $25,000 loan to Christman, a financial statement was prepared by Dwight. On that document, the title to the shares of stock in the First State Bank of Monticello was shown to be in Dwight's name alone. O'Neill never took note of this. O'Neill was aware that Dwight did not have enough assets to pay the $6.5 million verdict which resulted in the Macon County case, and that was one of the reasons Dwight was referred to Reu. Reu was acting as agent for the bank in making an investigation of the feasibility of accepting the stock.

At this point in the proceedings, judicial notice was taken of the fact that the 35-acre parcel adjoining the Dosses' Monticello residence was sold at a judicial sale. The sale price was basically the amount of the principal and interest due on the loan. The total due was $125,401.13. O'Neill is sure he made requests of the Dosses to provide current financial statements, but there is no formal documentation of such requests in the bank records. The bank would like a current financial statement once each year to keep the auditors happy and to evaluate the nature of the security.

Considering the background of the loans, the reason the decision was made to loan Dwight new money was the unsecured nature of the note signed by Arvilla. Dwight offered security on the new loan and the bank officials felt more comfortable in that position.

Arvilla never participated in any of the negotiations with O'Neill concerning the transfer of the 733 shares. It really does not matter in whose name the shares are registered, as long as the stock is validly tendered. When Dwight contacted O'Neill, he did not ask O'Neill to keep the transaction a secret, he did not indicate an intent not to pay his other creditors, and he did not ask O'Neill to participate in any transaction with the intent of defrauding any creditors.

When O'Neill first saw the certificate of stock on Saturday, September 22, 1984, the name of the Marine American National Bank of Champaign, Illinois, was already on it. Until that time, he had no

knowledge of the transfer of the shares. O'Neill is in charge of the discount brokerage portion of the organization and customers bring in certificates of stock every day. Stock certificates are negotiable instruments and he merely has them sign the back, in blank, and sends the certificate off for transfer. He does not contact the transfer agent to establish ownership. The value assigned by Marine to the stock in the First State Bank of Monticello was $130 per share.

O'Neill identified a memorandum dated September 24, 1984, directed to the loan committee. On the copy of the memorandum is a handwritten notation, "John Corley, 762-9431, stock carried on books and 'other investments' 10-1-85 at 95,546.12." There is an additional notation of $130 and a calculation of which O'Neill does not recall the significance. There were additional handwritten amendments to the memorandum and notations on the second page. One notation indicates that in January 1985 Arvilla was paid $2,473.73 as a dividend. The memorandum indicates an agreement to refund three-fourths of the dividends back to Doss by way of crediting it to payments due in 18 months. O'Neill explained that, at the time, it was anticipated Corley and Ballsrud were going to purchase the shares relatively quickly, in which case no dividend would be received. But if Marine did receive a dividend, then three-fourths would be paid to Doss as a credit. However, Corley and Ballsrud did not purchase the stock, the dividend was paid, and Dwight "came in and leaned on us to get it." So the bank wrote a check to Arvilla. Arvilla did not come to the bank concerning the dividend. The dividend referred to was for the year 1984.

Rex Reu is an attorney who was associated with the legal firm of Reno, O'Byrne & Kepley from November 1978 to April 1985. That law firm is general counsel for Marine. Reu was asked to work on a proposed loan to the Dosses. Dwight was contacted by Reu, and Dwight indicated the amount he wanted to borrow, and they discussed the terms.

At that time, Reu was aware of the Macon County verdict. He became aware of it through the media and followed up by obtaining a copy of the docket entry. When Reu became aware of the verdict, he told Dwight the only way the transaction could be accomplished would be if the bank was secured ahead of the proposed judgment that was to be entered on the verdict. There was another loan pending with Arvilla that the bank required to be paid off. If the existing loan was not paid off, there would be no deal on the new money. The possibility of paying off the existing loan by transfer of stock in the First State Bank of Monticello was discussed.

Reu called the Monticello Bank to ascertain the per share value of the stock. He believes he did determine that Arvilla owned the stock. This conversation took place before the stock was received, anywhere from five days to two weeks before the transaction was closed. There was some disagreement as to the value of the stock, but this was negotiated.

Reu identified a copy of a September 12, 1984, letter to Dwight in which Dwight was asked to provide an updated financial statement. The financial statement was not provided to Reu. Reu examined the abstract of title for the property adjacent to Dwight's house and prepared the mortgage documents therefor. Once the title had been examined and a preliminary title opinion rendered, the transaction was closed.

The closing took place at Marine on Saturday, September 22, 1984. Dwight, Arvilla, O'Neill, and Reu were present. At the closing, Dwight signed a new note and executed the mortgage. Calculations were done regarding the prepayment of the first two or three installments. Since Marine was taking a first mortgage on the property, the prior mortgage with the First State Bank of Monticello had to be paid off. Reu went there to pay off the mortgage and to obtain a release. Before he did that, he did a judgment search in the Piatt County courthouse, which was open for voter registration. He determined that no memorandum of judgment had been filed recently in the Piatt County recorder's office. He did not go to the circuit clerk's office to check lawsuits. He is not sure the circuit clerk's office was open. Reu had not had the property appraised. O'Neill either looked at it or had it appraised. In any event, the bank was satisfied with the value of the property as security. Reu then proceeded to the Monticello bank, there tendering the draft in payment of the preexisting mortgage and obtaining the release. He then went to the Dosses' residence. Dwight, Arvilla, and Glasgow were present. He gave Dwight a check and received a stock certificate in the First State Bank of Monticello issued in the name of Marine. He then returned to Marine to deliver the certificate.

Reu had no concerns about the title to the stock. Arvilla had an outstanding loan that was being paid off with shares of sufficient value to partially discharge the obligation. The stock certificate had been issued and it was in proper form. There was nothing to indicate any problem. He saw no need to seek any kind of express warranty or indemnification. He was aware that under section 8—306 of the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1983, ch. 26, par. 8—306), in the article on investment securities, transferor made an im-

plied warranty of validity and title. Reu investigated the possibility of an involuntary bankruptcy and the effect it would have on the transaction, but he could not recall if it was before or after September 22, 1984.

Arvilla did not participate in any of the negotiations leading up to the loan transaction. Reu had been involved in other transactions involving the transfer of stock and had never had occasion to require an express warranty relative to a transfer. Nor had he heard of it. He did not go to the Monticello Bank to review the stock register. He did talk to at least one of the officers to determine the value of the stock. His inquiry was not to determine the ownership of the shares, but he had to know who owned the stock in order to inquire about the value. Dwight had already spoken to the personnel at the Monticello Bank and they were aware there was going to be a transfer of shares to Marine. Reu had no knowledge that 3,000 shares had been transferred from Dwight to Arvilla.

Reu did not contact anyone from Commercial regarding this transaction. He did not work for Commercial. At the time of the transaction, the banks were completely independent of each other. Reu became aware that the Dosses also had a transaction with Commercial only after the transaction with Marine was concluded.

Reu's assigned duty was to assure a proper first mortgage on the real estate. His duties did not involve negotiating the transaction or deciding whether or not a loan should be made or deciding the terms with regard to cash or property in kind which would be accepted in satisfaction of the existing note. Nor was he to conduct a title search as to the ownership of the proffered stock. He did not prepare any assignment document of stock powers in connection with this transaction, and the first time he saw the stock certificate it was already made out in the name of Marine, and that was when it was delivered to him. He had never seen the preceding certificate. The securities work done by the law firm involved issuing stock in closely held corporations, which the firm set up. Reu did not represent himself to be an expert in the field of securities law.

The trial court found the conveyance of the bank shares from Dwight to Arvilla was not a fraudulent conveyance. The trial court further found the defendant banks had no actual or constructive knowledge of the conveyance from Dwight to Arvilla. Therefore, the trial court entered judgment in favor of all defendants and against plaintiff.

Plaintiff's argument on appeal may be summarized as follows. The transfer from Dwight to Arvilla was presumptively fraudulent and,

since there is insufficient evidence to rebut the presumption, this court should decide the transfer was fraudulent. Plaintiff argues that since there is no evidence of consideration from the transaction and the transaction directly impaired or tended to injure a creditor, the fraud should be characterized as "fraud in law," in which case fraudulent intent on the part of the grantor or participation by the grantee in the fraud need not be proved to obtain relief. As a result, plaintiff argues, the banks did not acquire good title based on either "An Act to revise the law in relation to frauds and perjuries," commonly known as the Fraudulent Conveyances Act (Act) (Ill. Rev. Stat. 1983, ch. 59, par. 1 *et seq.*), or the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 1—101 *et seq.*). Plaintiff also argues this court's earlier decision in *Crawford County State Bank v. Doss* (1988), 174 Ill. App. 3d 574, 528 N.E.2d 436, should be distinguished and limited to its facts since there was no discussion of the Fraudulent Conveyances Act therein. However, that conclusion is not correct as there is a reference to the Act in the opinion. *Crawford County State Bank*, 174 Ill. App. 3d at 579, 528 N.E.2d at 439.

According to plaintiff, based on this unrebutted presumption of fraud, plaintiff should also be entitled to incidental and consequential damages pursuant to section 2—701(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—701(c)), which defines the nature of a declaratory judgment action. Defendants do not deny that, if plaintiff had succeeded in convincing the trier of fact that fraud had occurred, the plaintiff would have been entitled to such damages. However, if this court is convinced the judgment is against the manifest weight of the evidence, the cause will be remanded to the trial court for a consideration of whether, and to what extent, plaintiff is entitled to such damages. Therefore, an extended discussion of this contention is unnecessary.

Before proceeding further, the arguments of plaintiff must be set forth to assist understanding. There are two sets of defendants, Arvilla and the banks. Plaintiff argues Arvilla should pay damages pursuant to the Fraudulent Conveyances Act. The plaintiff contends, as to the banks, that plaintiff has superior title to the shares of stock. Plaintiff also argues the banks should pay damages to plaintiff.

In any event, the statutes must be considered in light of plaintiff's arguments. The relevant portions of the Fraudulent Conveyances Act read as follows:

> "Every gift, grant, conveyance, assignment or transfer of, or charge upon any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to

disturb, delay, hinder or defraud creditors or other persons, and every bond or other evidence of debt given, suit commenced, or judgment entered, with like intent, shall be void as against such creditors, purchasers and other persons." Ill. Rev. Stat. 1983, ch. 59, par. 4.

"The foregoing section shall not affect the title of a purchaser for a valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor." Ill. Rev. Stat. 1983, ch. 59, par. 5.

"This act shall not extend to any estate or interest in any lands, goods or chattels, or any rents, common or profit, out of the same, which shall be upon good consideration, and bona fide lawfully conveyed or assured to any person, bodies politic or corporate." (Ill. Rev. Stat. 1983, ch. 59, par. 8.)

Although section 4 was subsequently amended by Public Act 79—1362, section 19, effective October 1, 1976 (1976 Ill. Laws 956), these provisions were initially enacted in 1874 (Rev. Stat. 1874, ch. 59, §§4, 5, eff. July 1, 1874). These provisions are also general provisions dealing with conveyances of all types of property. (It should also be noted that these sections of the Fraudulent Conveyances Act have now been repealed and replaced by the Uniform Fraudulent Transfer Act (Ill. Rev. Stat. 1989, ch. 59, par. 101 *et seq.* (Pub. Act 86—814, eff. Jan. 1, 1990)).)

The Code, on the other hand, was enacted so as to take effect on July 1, 1962. (Ill. Rev. Stat. 1983, ch. 26, par. 10—101.) While the Act was not specifically repealed by the Code (Ill. Rev. Stat. 1987, ch. 26, par. 10—102), the Code devotes an entire article to investment securities. (Ill. Rev. Stat. 1983, ch. 26, pars. 8—101 through 8—407.) This case deals with the allegedly fraudulent transfer of investment securities. And, where special and general statutes deal with the same subject, the latest in date will not be considered to have repealed the earlier unless there are irreconcilable inconsistencies, but the special statute will prevail regarding applications to the subject matter within its provisions. (*Spaulding School District No. 58 v. Waukegan City School District No. 61* (1960), 18 Ill. 2d 351, 164 N.E.2d 63; *People v. Bailey* (1983), 116 Ill. App. 3d 259, 452 N.E.2d 28.) Therefore, it would appear resort must be made to the Code and the cases decided thereunder in determining the law applicable to whether plaintiff or defendant have superior title to the shares of stock. After all, the underlying purposes of the Code include, "to simplify, clarify and modernize the law governing commercial transactions," and "to make

uniform the law among the various jurisdictions." (Ill. Rev. Stat. 1983, ch. 26, pars. 1—102(2)(a), (2)(c).) Therefore, it appears the Code is primarily concerned with ensuring the negotiability of the shares by helping to maintain clear title.

With regard to establishing the title in the security between the parties, the following sections of the Code should be considered:

"Rights Acquired by Purchaser; 'Adverse Claim'; Title Acquired by Bona Fide Purchaser. (1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. 'Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.

(2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim.

(3) A purchaser of a limited interest acquires rights only to the extent of the interest purchased." (Ill. Rev. Stat. 1983, ch. 26, par. 8—301.)

"A 'bona fide purchaser' is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank." Ill. Rev. Stat. 1983, ch. 26, par. 8—302.

"Notice to Purchaser of Adverse Claims. (1) A purchaser (including a broker for the seller or buyer but excluding an intermediary bank) of a security is charged with notice of adverse claims if

(a) the security whether in bearer or registered form has been indorsed 'for collection' or 'for surrender' or for some other purpose not involving transfer; or

(b) the security is in bearer form and has on it an unambiguous statement that it is the property of a person other than the transferor. The mere writing of a name on a security is not such a statement.

(2) The fact that the purchaser (including a broker for the seller or buyer) has notice that the security is held for a third person or is registered in the name of or indorsed by a fiduciary does not create a duty of inquiry into the rightfulness of

the transfer or constitute notice of adverse claims. If, however, the purchaser (excluding an intermediary bank) has knowledge that the proceeds are being used or that the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, the purchaser is charged with notice of adverse claims." Ill. Rev. Stat. 1983, ch. 26, par. 8—304.

"(19) 'Good faith' means honesty in fact in the conduct or transaction concerned.

\* \* \*

(25) A person has 'notice' of a fact when

(a) he has actual knowledge of it; or

(b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this Act." Ill. Rev. Stat. 1983, ch. 26, pars. 1—201(19), (25).

▮ The plaintiff also contends that section 8—315 of the Code is applicable to this case. Section 8—315 states as follows:

"Action Against Purchaser Based Upon Wrongful Transfer. (1) Any person against whom the transfer of a security is wrongful for any reason, including his incapacity, may against anyone except a bona fide purchaser reclaim possession of the security or obtain possession of any new security evidencing all or part of the same rights or have damages.

(2) If the transfer is wrongful because of an unauthorized indorsement, the owner may also reclaim or obtain possession of the security or new security even from a bona fide purchaser if the ineffectiveness of the purported indorsement can be asserted against him under the provisions of this Article on unauthorized indorsements (Section 8—311).

(3) The right to obtain or reclaim possession of a security may be specifically enforced and its transfer enjoined and the security impounded pending the litigation." (Ill. Rev. Stat. 1983, ch. 26, par. 8—315.)

However, as both the Illinois Code Comment and the Uniform Commercial Code Comment indicate, section 8—315 deals with an owner's right to reclamation of possession of a security. (Ill. Ann. Stat., ch. 26, par. 8—315, Illinois Code Comment, at 285-86, Uniform Commercial

Code Comment, at 286 (Smith-Hurd 1974).) Since plaintiff has never been the owner of the securities in question, plaintiff cannot reclaim them under section 8—315.

■■ ■ As to whether plaintiff should have superior title to the shares, if Marine and Commercial are *bona fide* purchasers of the stock, then it matters not at all whether the conveyance between Dwight and Arvilla was fraudulent, unless the bank officials were aware of the fraud. (See *Krick v. First National Bank* (1972), 8 Ill. App. 3d 663, 290 N.E.2d 661.) As the statute notes, to be a *bona fide* purchaser, the bankers must have acquired the stock (1) for value, (2) in good faith, (3) without notice of adverse claims, and (4) have taken delivery of the securities in bearer form or in registered form issued to the banks. The only questions are whether the banks acted in good faith and without notice of an adverse claim. And, while the banks had the burden of proving they were *bona fide* purchasers, lacking notice and acting in good faith, at trial (*Erlich v. Nyberg* (1979), 78 Ill. App. 3d 500, 396 N.E.2d 1273), once the trial court has made such a finding, the question on appeal becomes whether the finding is against the manifest weight of the evidence. Even when there is a conflict in the testimony as to the extent of the knowledge concerning an adverse claim, the trial judge is in a better position than is the appellate court to weigh the evidence and ascertain the credibility of the witnesses, and therefore, a court of review will not reverse unless the finding is against the manifest weight of the evidence. (*Nyberg*, 78 Ill. App. 3d 500, 396 N.E.2d 1273.) A decision is against the manifest weight of the evidence if, after a review of the evidence, it is clearly evident that the conclusion opposite to the one reached by the trial court was the proper disposition. *Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 536 N.E.2d 1329.

As this court noted in the opinion in the earlier appeal in this case, the mere preference of one creditor over another is not fraud. The court concluded, however, that the transfer between the Dosses, if fraudulent, could have tainted the entire transaction if the bankers were or should have been aware of the fraudulent intent. *Crawford County State Bank v. Doss* (1988), 174 Ill. App. 3d 574, 528 N.E.2d 436.

■■ ■ The evidence is that the $6.5 million verdict was returned in the Macon County case on August 29, 1984. The docket sheet indicates that a written judgment order was to be filed. The judgment was not entered on the verdict until September 25, 1984. While the bank officials were probably aware of the verdict, a verdict which has not yet been reduced to a judgment cannot be considered an adverse

claim *against the title* of registered shares of stock. The term "adverse claim" cannot be used interchangeably between the Fraudulent Conveyances Act and the Code. An adverse claim under the Act is, in effect, a debt owed, a claim against a debtor. Under the Code, adverse claim refers to a claim to title in the shares. Plaintiff was not an owner and had no interest in the security at the time the banks received the shares. (See Ill. Rev. Stat. 1985, ch. 26, par. 8—301.) There was no notice of an adverse claim on the face of the certificate. (Ill. Rev. Stat. 1983, ch. 26, par. 8—304.) Nor were the bank officers aware there was a claim that the transfer would be considered wrongful. Nor was there any promise of secrecy. Doss had never disclosed to bank officials any intent to defraud or avoid payment to any creditors. The bank officers were unaware of the recent transfer of the shares from Dwight to Arvilla, even though Reu did know Arvilla owned the shares prior to the transfer to the bankers. But merely because Arvilla owned the shares does not, in and of itself, raise a suspicion that Dwight or Arvilla may have been attempting to defraud another creditor.

Plaintiff makes a great deal of the fact the banks had a financial statement from Dwight which indicated he alone owned the shares of stock. But those financial statements were several years old at the time of the transaction and would not have indicated whether the transfer from Dwight to Arvilla was very recent. Although there is evidence the banks were concerned about getting paid, at least before Dwight was forced into bankruptcy, it would appear that the conclusion opposite to that reached by the trial court is not clearly evident and, therefore, the judgment in favor of defendant banks is not against the manifest weight of the evidence.

Regarding plaintiff's argument that plaintiff was entitled to damages from the banks as parties to the fraud and not merely that plaintiff had superior title to the shares, the Fraudulent Conveyances Act must also be considered in assessing the propriety of the judgment in favor of the banks. However, on the facts of this case, it would appear the banks are bona fide purchasers under the Act as well.

Plaintiff relies on *First National Bank v. United States* (N.D. Ill. 1987), 653 F. Supp. 1312, for the proposition that the law imputes knowledge on the part of the banks as to the nature of the transaction even though they may have purposefully avoided inquiry as to the ownership of the stock. As the subsequent opinion on appeal makes abundantly clear, the rationale for such a finding was the failure to observe mandatory Federal regulations requiring verification of collateral. (*First National Bank v. Lewco Securities Corp.* (7th Cir. 1988),

860 F.2d 1407.) The shares of stock here were not pledged as collateral. Furthermore, there was no evidence of any mandatory Federal regulation applicable to the transaction in the case at bar. Therefore, plaintiff's reliance on this case is misplaced.

■ The remaining question is whether the judgment in favor of Arvilla is against the manifest weight of the evidence. A transfer of an interest in property may be set aside as fraudulent if the transfer tends to hinder or defeat the rights of a grantor's creditor. There is a presumption of fraud where there is a voluntary transfer for no consideration and there is an existing or contemplated debt for payment of which the transferor did not retain sufficient assets. (*Kardynalski v. Fisher* (1985), 135 Ill. App. 3d 643, 482 N.E.2d 117.) Such a transaction is considered "fraud in law" and plaintiff need not establish fraudulent intent on the part of the transferor or participation in the fraud by the transferee to obtain relief. (*Reagan v. Baird* (1985), 140 Ill. App. 3d 58, 487 N.E.2d 1028.) Once the presumption is raised, the defendant may rebut the presumption by proving that adequate consideration had been given or that the transferor retained sufficient assets to cover the debt. *Anderson v. Ferris* (1984), 128 Ill. App. 3d 149, 470 N.E.2d 518.

■ ■ Although Arvilla denied the transfer of the 3,000 shares from Dwight to her was a gift, there was no proof of any consideration tendered therefor. And it is clear Dwight had insufficient assets to cover the debt after the transfer of the shares.

However, since the presumption merely supplies the otherwise missing element of intent to defraud creditors, the presumption may also be rebutted with evidence which, if believed, establishes the absence of fraudulent intent on the part of the parties to the transaction. According to Arvilla, the conveyance was not to defraud creditors, in general, but was to pay certain creditors in preference to plaintiff. This court's earlier decision stated that such preference of creditors is not a fraudulent conveyance unless made in bad faith. In such a circumstance, the factors to be considered in determining bad faith are these:

> "(1) [T]he insolvency of the debtor; (2) the consideration for the conveyance; (3) the status of the judgment; (4) whether all the assets of the debtor are reduced for cash; and (5) whether the asset conveyed is the only remaining unencumbered asset of the debtor." *Crawford County State Bank v. Doss* (1988), 174 Ill. App. 3d 574, 580, 528 N.E.2d 436, 440.

It is clear from the facts of this case that the presumption has not been rebutted and that judgment should have been entered in favor of

plaintiff against defendant Arvilla Doss in the amount of $390,000, the value of the 3,000 shares of stock transferred to her by her husband. Accordingly, the order of the circuit court of Piatt County is affirmed as to Marine and Commercial, but the judgment is reversed as to defendant Arvilla Doss and the cause is remanded with directions that judgment be entered in favor of plaintiff and against defendant Arvilla Doss in the amount of $390,000. The trial court should also consider whether plaintiff is entitled to any incidental or consequential damages as a result.

Affirmed in part; reversed in part and remanded with directions.

KNECHT, P.J., and GREEN, J., concur.